UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

ESTATE OF JAQUYN O'NEILL )
LIGHT, ex rel. JAMES HUNT )
JOHNSON, Administrator, )
                                                              )    Case No. 1:22CV59
        Plaintiff, )
)
   v. )
)
MARCUS POLLOCK, et al., )
)
        Defendants. )

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This is a civil rights action filed under 42 U.S.C. § 1983 by the Estate of decedent Jaquyn Light, alleging violations of the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, as well as related state-law claims, against the City of Graham (hereinafter "the City"), Graham Police Chief Jeff Prichard, and Graham Police Officer Marcus Pollock arising from Mr. Light's officer-involved shooting death. The matter comes before the Court on Defendants' Motion for Summary Judgment. Defendants contend that the shooting was a lawful use of deadly force, and that the § 1983 claims should therefore be dismissed "on the merits and on the basis of qualified immunity." Defendants similarly contend that all of Plaintiff's state law claims fail because the shooting was an objectively reasonable use of deadly force. However, as further set out below, apparent differences in Officer Pollock's account of the shooting raise issues that cannot properly be resolved on a motion for summary judgment. Therefore, given the genuine issues of material fact, Defendants' Motion for Summary Judgment [Doc. #47] will be denied as to the claims against

Officer Pollock and the City. However, because Plaintiff has not presented any factual basis for a § 1983 claim against Chief Prichard, and because public official immunity would apply with regard to any state law claim against Chief Prichard, summary judgment will be granted as to the claims against Chief Prichard.

I.   STANDARD

Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

With respect to the types of constitutional claims asserted here, the Fourth Circuit has explained that, for excessive force claims:

> [W]e use an objective reasonableness test to determine whether excessive force was used. Elliott v. Leavitt, 99 F.3d 640, 642-43 (4th Cir. 1996) (first citing Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); and then Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)). When *deadly* force is used, we have a more specific test for objective reasonableness. In those cases, we consider whether the hypothetical

2

reasonable officer in that situation would have had "probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others." Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005) (quoting Garner, 471 U.S. at 11, 105 S. Ct. 1694). That determination must focus on the moment that deadly force was used, not the whole episode. Elliott, 99 F.3d at 643. And the justification for deadly force can fall away in seconds. Waterman, 393 F.3d at 481. In questioning the split-second decisions of police officers, we must avoid hindsight bias and try to place ourselves in the heat of the moment. Elliott, 99 F.3d at 642.

. . . Then, we view that excessive-force claim through the lens of the affirmative defense of qualified immunity. When a qualified-immunity defense is raised, we apply a two-step test. We must determine, first, whether the facts viewed in [the plaintiff's] favor make out a violation of [the decedent's] constitutional rights, and second, whether that violated right was clearly established at the time. See Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

Stanton v. Elliott, 25 F.4th 227, 233 (4th Cir. 2022) (internal brackets omitted). Even as to these claims, at summary judgment, "[w]e view the evidence in the light most favorable to the plaintiff; we draw all reasonable inferences in his favor; and we do not weigh the evidence or make credibility calls, even if we do not believe he will win at trial. Once all that is done, we can only grant summary judgment where no material facts are genuinely disputed, and the [defendants] are entitled to win as a matter of law." Id. at 234 (internal citation omitted).

II.  FACTS RELATED TO SUMMARY JUDGMENT

At a broad level, and for the purposes of this Motion, the Parties agree on the facts preceding the shooting and the general facts of the shooting itself.

On the night of January 28, 2020, Officers Brandon Land, Marcus Pollock, and Keith Scoggins of the Graham Police Department attempted to execute arrest warrants for Jaquyn Light, age 20, who they believed was visiting a residence in Graham. The warrants were for misdemeanor assault and for felony probation violations for absconding. When the officers

3

arrived at the residence, they noticed that the front porch was covered with black plastic draping that blocked the entrance. Officer Pollock remained in the front while Land and Scoggins went to the back of the house together. Land and Scoggins activated their body-worn cameras, but Pollock did not. Either Scoggins or Land knocked on the back door and had a conversation with a woman inside who stated that Light was not present. As he stood at the back door, Scoggins saw Light inside and called into the house "Jaquyn, come outside," the woman stepped aside, and Scoggins went in the door. At this point, Light ran away from Scoggins toward the front door, and Scoggins announced this fact on his police radio. Pollock, who was still outside and near the front door, heard this transmission and drew his firearm. Shortly afterward, Light ran out of the front of the house and came through the black plastic draping, Pollock announced "Graham Police," and Light ran away from the house toward Pollock. Pollock fired a single shot, which struck Light in his abdomen. No weapon was found on Light's person. Police officers requested EMS assistance, and Pollock rendered aid until they arrived, but Light died from his gunshot wound. (See Defs.'s Br. [Doc. #48] at 3-7; Pl.'s Br. [Doc. #54] at 1-5.)[1]

However, while these general facts and the background preceding the shooting are not in dispute, the detailed facts of what Mr. Light did, what Officer Pollock therefore observed or could have observed, and what reasonable actions, if any, Officer Pollock could have or did

---

[1] The Court notes that in the briefing, Plaintiff raises assertions regarding the other officers' lack of a warrant before entering the house prior to the shooting, but this does not appear to be the basis for a claim that is (or could be) asserted by Plaintiff. Additionally, the Court notes that Plaintiff makes repeated references to purported violations of Graham Police Department policy in how the officers conducted themselves on the night of the shooting (Pl.'s Br. at 2, 9-10, 17-19). However, a failure to follow internal policies alone is not actionable under § 1983 "unless the alleged breach of policy rises to the level of a constitutional violation." Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013).

4

perform in response to those observations are unquestionably disputed, as will be discussed below.

III. DISCUSSION

    A. <u>Disputes of Material Fact Preclude Summary Judgment as to Defendant Pollock</u>

In moving for summary judgment, Defendants rely exclusively on Officer Pollock's Declaration filed with the Motion for Summary Judgment. (See Defs.'s Br. at 3-7) (citing Pollock Decl. [Doc. #47-1] ¶¶ 3-12); Defs.'s Reply [Doc. #61] at 2 (citing Pollock Decl. ¶ 4).) In the Declaration, Officer Pollock notes that Mr. Light had past arrests for assault and attempted robbery with a dangerous weapon, and Officer Pollock claims that he shot Mr. Light intentionally because he feared for his life when Light charged and tackled him, based on his fear that Light was attempting to grab his gun. Notably, however, the record reflects that Officer Pollock's description of the shooting, his reasons for fear, and even whether he intended to shoot, have varied at different points of time.

Specifically, the record reflects that after hearing the gunshot, Officers Land and Scoggins came to assist, and they asked if Mr. Light had shot at Officer Pollock. Officer Pollock replied, "No. He ran into me and my gun went off." (Pollock Decl. ¶ 12; Scoggins Dep. [Doc. #56] at 64, 66.) This statement is memorialized in officer-worn body-camera footage from Officer Scoggins. (Body Camera Footage [Doc. #60] at 03:48.) In his current Declaration, Officer Pollock concedes that this initial description of the shooting, given while still on scene and immediately after discharging his firearm, implied that his "firearm discharge was accidental," but Officer Pollock maintains in the Declaration that he has "at all times

5

believed I fired it intentionally, consistent with my close-quarters combat training." (Pollock Decl. ¶ 12.)[2]

During his deposition, three years after the shooting, Officer Pollock stated that he believed that Light "had something in his hand" and "was going to come down and hit me" because "when he exited and came at me he had his right arm raised above his head" and that "caused me to believe that he was trying to harm me." (Pollock Dep. [Doc. #57, #57-1] at 211.) Officer Pollock testified that this was a "critical piece" of his decision-making in deciding to fire his weapon, and was "the imminent part of possibly being injured." (Pollock Dep. at 212-15.) This account indicates that Light was intentionally charging at Officer Pollock with his arm raised and with something in his hand, about to strike, and that Officer Pollock reacted in fear of being attacked with a weapon. However, none of the prior statements or investigation reports reflect this account. For instance, in his prior statement to the Graham Police Department, Pollock stated that "[b]ecause of the low light conditions [he] could not see the suspect's hands." (Graham PD Report, Pollock Dep. Ex. 20, at 2.) Now, in the Declaration submitted with the Motion for Summary Judgment, Officer Pollock states, in contrast to both prior statements, that Mr. Light "charged right into me with his right hand raised upward," but he no longer states either that he could not see his hands nor that he believed that Mr. Light was holding on to anything or even that he appeared to be about to strike Officer Pollock, with a weapon or otherwise. (Pollock Decl. ¶ 8.) Rather, Pollock now

---

[2] The District Attorney later prepared a report on whether charges would be brought against Officer Pollock, but ultimately declined to bring charges based on the conclusion that the shooting was most likely an accidental discharge, given Officer Pollock's initial account, but could also have been in self-defense, without reaching a definitive conclusion as to what may have occurred. (Pollock Dep. [Doc. #57, #57-1] at 286-87; District Att'y's Report [Doc. #58-1] at 9-10.)

6

states that he feared Light was "attempting to overpower me, grab my gun, and use it against me." (Pollock Decl. ¶ 9.)

Thus, Officer Pollock's own accounts reflect variations in the factual assertions and justifications which cannot be reconciled or resolved on a motion for summary judgment. See Knibbs v. Momphard, 30 F.4th 200, 207 (4th Cir. 2022) (on summary judgment in use of deadly force case, Court must view "the facts in the light most favorable to the Estate as the non-moving party," which means that the Court "may not credit Defendants' evidence, weigh the evidence, or resolve factual disputes in Defendants' favor" (internal brackets, ellipsis, and quotation omitted)). While it is possible that either qualified immunity could apply or that no constitutional violation could be established where the shooting was (1) accidental, caused by Mr. Light running into Officer Pollock and causing an accidental discharge, as indicated by Officer Pollock at the scene; or (2) self-defense based on Mr. Light charging at Officer Pollock with his right hand raised and holding what Officer Pollock reasonably believed was a weapon, as indicated by Officer Pollock at his deposition; or (3) self-defense based on Mr. Light charging into Officer Pollock and tackling him in what Officer Pollock reasonably believed was an attempt to grab his gun, as asserted by Officer Pollock in his Declaration, it cannot be all three at once, and there appears to be factual disputes as to what occurred, even just considering Officer Pollock's own accounts. Officer Pollock's explanations and attempts to reconcile these accounts would be for the jury to consider, and ultimately it will be for the jury to decide whether Officer Pollock's account at trial is credible. As noted above, a court considering a motion for summary judgment "cannot weigh the evidence or make credibility determinations," Tekmen v. Reliance Standard Life Ins. Co., 55 F.4th 951, 959 (4th Cir. 2022)

(internal quotation omitted), and "[i]n general, if an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate," Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (internal quotation omitted).

This is especially true in a case like this one, where in an unrecorded encounter between two individuals with no other witnesses, during which one party to the interaction was killed, there is necessarily only one party—Officer Pollock—on whom the basic facts of what Mr. Light did can be based. In that scenario any dispute over Officer Pollock's version of what happened is important in resolving the claims and the potential immunity defenses. Borrowing the language of the Fourth Circuit in a factually-similar use of deadly force case involving a motion for summary judgment:

> Special difficulties can arise during summary judgment in use of deadly force cases like this one because [the officer] has killed the only other potential witness that can directly refute his account of what happened on the porch. Without [the decedent's] account, it can be easy to overvalue the narrative testimony of [the officer] and to undervalue potentially contradictory . . . evidence. We are therefore mindful of Rule 56's demand to avoid simply accepting [the officer's] self-serving statements and consider *all* contradictory evidence.

Knibbs, 30 F.4th at 216 (internal brackets, ellipsis, and quotations omitted); see also Stanton, 25 F.4th at 234 ("With deadly force cases, special difficulties can arise during summary judgment. Often, the officer has killed the only other potential witness. Courts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence."). In cases like this, "a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be

8

Case 1:22-cv-00059-JEP   Document 62   Filed 05/08/24   Page 8 of 20

rejected at a trial." Ingle ex rel. Est. of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (emphasis added) (quoting Plakas v. Drinski, 19 F.3d 1143, 1147 (7th Cir. 1994)); see also Stanton, 25 F.4th at 234 ("We need only apply our normal summary-judgment rules, which ask whether reasonable juries might disagree over some material factual dispute.").

Notably, in addition to the three scenarios contemplated above, there is also a fourth possibility, endorsed by Plaintiff: that Light was attempting to run away and was not a threat when he was shot, based on other statements by Officer Pollock and other circumstantial evidence. In his deposition, Officer Pollock testified that he thought Light was coming at him and "if he could get away from me, he would," and further testified that in his mind he thought Light might "get through" him to run away, and testified that he did not want Light to run away because it was his job to arrest him for the warrants. (Pollock Dep. at 243-44, 259-61.) Similarly, the State Bureau of Investigation ("SBI") undertook an investigation, and the SBI report reflects that "Officer Pollock stated he felt compelled to shoot because he was interacting with someone who was not obeying commands and running from law enforcement. Officer Pollock had a fear for his safety due to Light running at Pollock and [Pollock was] not sure if Light was armed." (SBI Report, Pollock Dep. Ex. 21, at iv.) Based on these accounts by Officer Pollock, Plaintiff contends that there is at least some basis to believe Officer Pollock shot Light to prevent him from running away. In addition, the Greensboro Police Department also undertook an Internal Affairs investigation, and the report of that investigation reflects that Officer Pollock reported that when Light ran down the steps, he (Officer Pollock) grabbed Light with his left hand and had his firearm in his right hand. (Graham Police Internal Affairs Report, Pollock Dep. Ex. 19, at 4; Graham PD Report

9

at 2.) The SBI Report synopsis likewise reflects that Officer Pollock reported that he grabbed Light with his left hand and had his firearm in his right hand and fired one shot. (SBI Report at iv.) Officer Pollock also testified at his deposition that he did not recall Light ever reaching for his (Officer Pollock's) gun. (Pollock Dep. at 187.) Based on these statements by Officer Pollock, Plaintiff contends that there is at least some basis to believe Officer Pollock grabbed Light and then shot him without justification, to prevent him from running away.

In addition to the statements by Officer Pollock, Plaintiff also notes that the record reflects that Light was not armed with any weapon, that Light was smaller than Officer Pollock, and that because of the darkness and lack of any exterior lights, Light likely did not even see Officer Pollock as he tried to run away, which was the conclusion of the Chief of Police and the District Attorney's Office.³ (Prichard Dep. [Doc. #54-1] at 73, 153-54; District Att'y's Report at 8.) Plaintiff also notes that Officer Pollock did not activate his body worn camera, so there is no video to confirm his account.⁴ In addition, having reviewed the body worn camera footage from Officer Scoggins submitted by Plaintiff in response to the Motion for Summary Judgment, the Court notes that the audio is not conclusive as to what commands or notification Officer Pollock gave, or the timing of those commands prior to the shooting.

---

³ The District Attorney's investigation report also reflects that: Light could have been unaware that it was Pollock, and not the officers behind him in the house, who had announced "Graham Police"; "Light would have been unable to see ahead clearly enough to react safely" when he was running toward Pollock; Light was unarmed; and "[i]t is not reasonable to believe that Light intended to physically engage an armed Officer Pollock." (District Att'y's Report at 8-9.)

⁴ Plaintiff also notes that Officer Pollock has a history of discipline for failing to activate his body worn camera, and that Officer Pollock resigned from his prior position with the Greensboro Police Department because he was facing a disciplinary hearing on an incident in 2016 when he failed to activate his body worn camera prior to a vehicle pursuit and then made false representations regarding his failure to properly activate a tachograph device in his car that would have measured the actions of the patrol car, and took deceptive actions to attempt to cover up his failure before it was discovered. (Pollock Dep. at 141-50.)

Finally, the autopsy report reflects that Light was shot one time, with an estimated range from two inches to two feet (District Att'y's Report at 8), which could support Officer Pollock's account that Light charged and tackled Pollock at the time the shot was fired but could alternatively support the conclusion that Light was two feet away from Pollock and attempting to run away from the officers chasing him through the house when Pollock grabbed him to stop him from running away and then fired the shot. Plaintiff contends that based on the evidence in the record, including Officer Pollock's own varying accounts, the jury could find that Light was shot while he was unarmed and running away, that Light did not see Officer Pollock in the dark and did not have his arm raised and was not attempting to strike or harm him, that Light did not attack or assault Officer Pollock, that Light was not attempting to reach for Officer Pollock's gun, that Officer Pollock grabbed Light to prevent him from running but then shot him, that Officer Pollock never saw a weapon, that a reasonable officer would not have believed Light was an imminent threat of death or serious injury, and that in the immediate aftermath Officer Pollock told other officers that his gun just "went off" in an attempt to avoid culpability for the shooting, but later changed his account in various ways to attempt to argue that the shooting was justified.[5]

Defendant nevertheless contends that summary judgment is appropriate based on case law reflecting that "deadly force is appropriate against even unarmed persons who suddenly aggress an officer whose gun is out." (Defs.'s Reply at 4 (citing <u>Mitchell v. Schlabach</u>, 864

---

[5] Given the possibility that Officer Pollock's initial statement that the shooting was accidental could be viewed as an attempt to downplay his intentional actions, and thus, potentially, an acknowledgement of culpability, a jury could reasonably reject his testimony, whether because its inconsistencies call his credibility entirely into question or because the initial spontaneous description of the shooting can be viewed as an attempt to downplay his culpability, and thus an acknowledgment of that culpability.

11

F.3d 416 (6th Cir. 2017); Carswell v. Borough of Homestead, 381 F.3d 235 (3d Cir. 2004); Wenzel v. City of Bourbon, 899 F.3d 598, 602 (8th Cir. 2018)).) However, in those cases there was no genuine issue of material fact as to what had occurred because the entire incident was captured on video, as in Mitchell, 864 F.3d at 421-22, and Wenzel, 899 F.3d at 600, or the case was decided after presentation of the plaintiff's evidence at trial, including eyewitness testimony of other officers, as in Carswell, 381 F.3d at 237. Here, as noted above, there is no video of the incident because Office Pollock did not activate his body worn camera, and Defendants cite only to Officer Pollock's Declaration in support of the Motion for Summary Judgment. Defendants do not cite any other evidence, and as discussed above, Officer Pollock's original reports and statements about the shooting now appear to conflict with his Declaration and his present theory of the case. This calls into question, at least at the summary judgment stage, his descriptions of what Mr. Light did prior to and during the shooting, and it has long been established that officers may not use deadly force to prevent an unarmed, nondangerous suspect from fleeing; instead the use of deadly force is justified only if the officer had probable cause to believe the suspect posed a threat of serious physical harm to the officer or others, as discussed above. See Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)).

Because there are genuine issues of material fact regarding what occurred that evening that could have justified Officer Pollock's use of force, with many of those issues created by Officer Pollock's own varying accounts, and because resolution of this case will hang on the credibility of Officer Pollock, which must be determined by a jury, summary judgment is

inappropriate, and Defendants' Motion for Summary Judgment will be denied. See Knibbs, 30 F.4th at 216; Ingle, 439 F.3d at 195.[6]

---

[6] With respect to the state law claims against Defendant Pollock, Defendants raise the same arguments in support of summary judgment, contending that the "objective reasonableness of the use of deadly force bars the state law claims as well." (Defs.'s Br. at 12.) However, there are genuine issues of fact with regard to that contention, as set out above. The Court also notes that, as explained by the Fourth Circuit,

> Instead of utilizing general negligence principles, the North Carolina General Assembly has "codif[ied] and clairf[ied] those situations in which a police officer may use deadly force without fear of incurring criminal or civil liability" in a separate statute. State v. Irick, 291 N.C. 480, 231 S.E.2d 833, 846 (1977). Relevant here, that statute provides that an officer is justified in using deadly force if it is "reasonably necessary . . . [t]o defend himself or a third person from what he reasonably believes to be the use of Imminent deadly physical force." N.C. Gen. Stat. § 15A-401(d)(1)-(2).
>
> But even if a police officer acting under the color of state law violates North Carolina's use of deadly force statute, that officer still may be entitled to public official immunity from a wrongful death suit brought against him in his individual capacity. See Mills v. Duke Univ., 234 N.C. App. 380, 759 S.E.2d 341, 344 (2014). Distinct from qualified immunity under § 1983, which is a purely objective analysis, North Carolina's public official immunity doctrine "involves a determination of the subjective state of mind of the governmental actor." Andrews v. Crump, 144 N.C. App. 68, 547 S.E.2d 117, 123 (2001). Under this framework, "a public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Wilcox, 730 S.E.2d at 230. . . .
>
> "[E]lementally, a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Wilcox, 730 S.E.2d at 230. The intent to injure can either be "actual" or "constructive." Id. at 231. North Carolina law "presumes 'that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law,'" so evidence of malice "must be sufficient by virtue of its reasonableness, not by mere supposition." Doe v. City of Charlotte, 273 N.C. App. 10, 848 S.E.2d 1, 12 (2020) (quoting Strickland v. Hedrick, 194 N.C. App. 1, 669 S.E.2d 61, 68 (2008)).
>
> . . . As with the § 1983 claim discussed earlier, genuine issues of material fact preclude us from affirming the district court's grant of summary judgment to [the Deputy].
>
> We begin with the requirement that the officer not take an action that a reasonable man would know is contrary to his duty. In that regard, we have previously held that the use of deadly force in violation of North Carolina's deadly force statute, N.C. Gen. Stat. § 15A-401(d), is an act done contrary to an officer's known duties, see Hensley, 876 F.3d at 587-88. The same facts that a jury could find that would permit the conclusion that [the Deputy's] use of force was unreasonable under the Fourth Amendment would also permit a finding that he acted contrary to his duties as a law enforcement officer because he violated the use of deadly force statute. See Hensley, 876 F.3d at 587-88.
>
> Next, [the Deputy's] actions must not have been taken "wantonly," that is, they must not have been committed "needlessly, manifesting a reckless indifference to the rights of others." Grad v. Kaasa, 312 N.C. 310, 321 S.E.2d 888, 890-91 (1984). . . . This presents a classic jury question. Assuming that a jury would credit the Estate's evidence, as we must at the summary judgment stage, it could find that [the Deputy] acted wantonly.

B.  The Claims Against the City

Defendants also move for summary judgment with respect to the § 1983 claim against the City in Count 1. However, in support of this contention, Defendants only contend that Plaintiff cannot establish any constitutional violation by Pollock, so no Monell claim can be established either. (Defs.'s Br. at 11-12.) However, with respect to this contention, there are material factual disputes with respect to whether Plaintiff can establish a constitutional violation by Pollock, as discussed above. Therefore, Defendants are not entitled to summary judgment based on this contention.[7]

---

. . . .

> The North Carolina Court of Appeals has emphasized that "mere reckless indifference is insufficient" to show a constructive intent to injure. Wilcox, 730 S.E.2d at 232. Instead, a plaintiff must also show that the defendant's actions were "so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to justify a finding of [willfulness] and wantonness equivalent in spirit to an actual intent." Id. at 231 (alteration in original) (quoting Foster v. Hyman, 197 N.C. 189, 148 S.E. 36, 38 (1929)). This question is a factual one, id. at 232, which North Carolina courts typically reserve for a jury, see, e.g., Leiber v. Arboretum Joint Venture, LLC, 208 N.C.App. 336, 702 S.E.2d 805, 813 (2010).

Knibbs, 30 F.4th 227-28. Thus, Plaintiff will be required to establish much more than negligence, and to the extent Plaintiff relies on an allegation of malice, Plaintiff will instead be required to establish that Officer Pollock was "so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to justify a finding of [willfulness] and wantonness equivalent in spirit to an actual intent" as explained in Knibbs. This determination is for the jury to resolve, and summary judgment would not be appropriate as to the state law claims against Officer Pollock.

[7] The Court notes that Defendants move for summary judgment on the Monell claim against the City only on the basis that Pollock was justified in shooting Light and that as a result no constitutional violation occurred for which the City could be held liable. (Defs.' Br. at 11-12.) They have therefore failed to raise any argument related to whether the City had any policy, pattern, custom, or practice related to Pollock's actions for which Monell liability could arise. See, e.g., Walker v. Prince George's County, 575 F.3d 426, 431 (4th Cir. 2009) ("Under Monell, a municipality's liability arises only where the constitutionally offensive actions of employees are taken in furtherance of some municipal policy or custom." (internal quotation omitted)). The Court will not address the issue *sua sponte*, especially where Plaintiff has not been given an opportunity to respond due to Defendants' failure to raise the issue in their main brief, but the issue can be considered further at trial.

14

Defendants also move for summary judgment on the state law claims against the City, contending that the state-law negligent hiring, supervision, training, or retention claims in Count 2 against the City should be dismissed because the record reflects that Pollock was undeniably acting as an agent of the City of Graham on the night of the shooting and, under state law, any liability would thus result from *respondeat superior*, and not negligent hiring or supervision. (Defs.'s Br. at 16-17 (citing O'Connor v. Corbett Lumber Corp., 84 N.C. App. 178, 182, 352 S.E.2d 267, 270 (1987)).) In response, Plaintiff fails to address Defendants' legal argument and merely states that "Plaintiff's state claims should survive summary judgment on the same grounds that support his §1983 claims." (Pl.'s Br. at 20.)

> The application of a theory of independent negligence in hiring, training, supervising, or retaining an employee is important in cases where the employee's acts were not within the scope of his or her employment. Hogan, 340 S.E.2d at 124. In such a case, this theory allows a plaintiff to establish liability on the part of the employer where no liability would otherwise exist. Id. In other words, these claims arise when an employee is acting outside the scope of employment, and they may only be asserted as an alternative to respondeat superior liability. Brown v. Tethys Bioscience, Inc., No. CIV.A. 1:10-1245, 2012 WL 4605671, at *6 n.4 (S.D. W. Va. Oct. 1, 2012).

Pracht v. Saga Freight Logistics, LLC, No. 3:13-CV-529-RJC-DCK, 2015 WL 5918037, at *8 (W.D.N.C. Oct. 9, 2015). Notably, however, Count 2 in this case is asserted against the City based on both the alleged negligence in hiring, supervision, and training and also based on *respondeat superior* liability with respect to the claims against Officer Pollock. Thus, Count 2 includes both alternatives. Defendant has not presented any basis or contention as to why that *respondeat superior* claim could not proceed to the extent that the state law claims against Pollock are proceeding. Therefore, the Motion for Summary Judgment as to Count 2 against

15

the City will be denied, but the nature of the claim will be further defined as appropriate at trial.

    C.    <u>The § 1983 and State Law Claims Against Defendant Prichard</u>

Defendants also move for summary judgment as to the § 1983 claim against Chief Prichard in Count 3. In Count 3, Plaintiff asserts a § 1983 claim against Chief Prichard in his individual capacity, alleging that Chief Prichard "condoned the actions of Pollock." (Am. Compl. ¶ 75.) Defendants contend that any claim against Chief Prichard on the basis that he "condoned" the shooting is unsupported by the record and, in any event, such post-hoc approval of a constitutional violation is not a proper basis for liability. (Defs.'s Br. at 11-12.) In response, Plaintiff contends that there is a basis for § 1983 liability against Chief Prichard because "Chief Prichard was Pollock's supervisor for defendant City," and because the claim is in fact one for "failure of supervision." (Pl.'s Br. at 20.)

Notably, however, Count 3 asserting a § 1983 claim against Chief Prichard does not allege that liability arises from a failure to supervise. (Am. Compl. ¶¶ 71-78.) Moreover, even if it did, Plaintiff's argument for liability against Prichard—that, despite not being on the scene, he nevertheless is responsible for Pollock's actions merely because he was a supervisor—is not a basis for § 1983 liability. Supervisors are not liable under § 1983 under a *respondeat superior* theory; rather, an individual is liable under § 1983 only when "the official charged acted personally in the deprivation of the plaintiff's rights." <u>Wright v. Collins</u>, 766 F.2d 841, 850 (4th Cir. 1985) (quoting <u>Vinnedge v. Gibbs</u>, 550 F.2d 926, 928 (4th Cir. 1977)). Therefore, to establish supervisory liability under § 1983, a plaintiff must show:

16

> (1) that the supervisor had actual or constructive knowledge that h[is] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and
>
> (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Wilkins v. Montgomery, 751 F.3d 214, 226 (4th Cir. 2014) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)). "[U]nder the third element, causation is established when the plaintiff proves 'an affirmative causal link'—a concept quasi-analogous to proximate cause—between the supervisor's inaction and the harm suffered." Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd., 31 F.4th 238, 258 (4th Cir. 2022).

The only evidence preceding the shooting that Plaintiff claims Defendant Prichard knew of that could be even remotely related to the shooting was the fact that Pollock's former employer had described Pollock as honest and reliable "in most situations," and the fact that Pollock had a history of failing to activate his body-worn camera. Plaintiff has not sufficiently made any legal or factual argument that either of these scenarios posed an unreasonable risk of constitutional injury. See, e.g., Jones v. Louisville/Jefferson Cnty. Metro Gov't, No. 3:18-CV-265-RGJ, 2022 WL 3582181, at *4 (W.D. Ky. Aug. 19, 2022) (collecting cases for the proposition that "there is no constitutional right to a recorded arrest"); Graham v. Rowe, No. 19-6757 (RMB-KMW), 2019 WL 3059801, at *4 (D.N.J. July 10, 2019) ("There is no constitutional right to be free from an arrest that is not recorded by a camera . . . ."). Moreover, there is no affirmative causal link to the shooting in this case. Plaintiff has not set out any factual basis to support the allegation that Defendant Prichard violated Plaintiff's

constitutional rights. Therefore, summary judgment will be granted with respect to the § 1983 claim against Defendant Prichard in Count 3.

Defendants also move for summary judgment as to the state-law claims against Defendant Prichard in Count 4, noting that there is no basis for a negligence claim against Defendant Prichard. This claim is asserted against Defendant Prichard in his "official capacity," and to the extent the claim is intended to be asserted against the City it is duplicative. To the extent Plaintiff is asserting general negligence claims against Chief Prichard for acts undertaken in the course of his employment, those claims would be barred by public official immunity, which would apply unless his actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Bartley v. City of High Point, 381 N.C. 287, 294, 873 S.E.2d 525, 533 (2022) (internal quotation omitted). Here, Plaintiff has not put forward any evidence of extra vires, malicious, or corrupt actions by Defendant Prichard. Therefore, even if there were some basis for alleging negligence claims against Chief Prichard, the claims would be barred by public official immunity, and Plaintiff has not pointed to any facts to support a negligence claim against Prichard or overcome public official immunity as to Defendant Prichard. Therefore, Defendant's Motion for Summary Judgment will be granted with respect to the negligence claim against Defendant Prichard in Count 4. As a result, no claims remain against Defendant Prichard.

D. State Constitutional Claim

Finally, Defendants argue that a claim under the North Carolina Constitution can only be asserted against the City, not the individual Defendants, and that because the City has not asserted sovereign immunity in support of summary judgment, adequate state-law tort

18

remedies exist for Plaintiff and any North Carolina constitutional claim should be dismissed. However, Defendants did assert sovereign immunity in their Answer. (Answer ¶¶ 27-28.) The Parties have not addressed the extent to which this claim could proceed if Defendants subsequently assert a governmental immunity defense at trial. Given the lack of full briefing on this claim, and given that Defendants continue to assert governmental immunity as a defense, the Court concludes that it would be helpful for the Parties to address this claim further. Therefore, the Motion for Summary Judgment on this claim will be denied as presently presented, but can be considered further before trial.

IV. SCHEDULING

The case is set for trial beginning July 22, 2024, and the Court will set the following schedule:

- By May 24, 2024, the Parties must exchange proposed jury instructions and jury verdict sheets.

- By May 31, 2024, the Parties must meet and confer and file a joint proposal for jury instructions and jury verdict form. Where there are disagreements, the Parties should so note and should each include two case citations supporting their position. The Court does not intend to allow any later requests for instructions or special interrogatories that are not included in this submission unless there is a specific showing of good cause, so the Parties should ensure that the submission is complete, as this is their opportunity to frame the issues and make any specific requests.

- The Parties must engage in a subsequent round of mediation during June 2024, in light of this summary judgment determination and the refining of the issues in the proposed jury instructions and jury verdict form. The Parties must schedule mediation sufficiently in advance and participate in the mediation by June 21, 2024.

- Any Motions in Limine or other pretrial motions must be filed by June 28, 2024, with responses due July 8, 2024.

- This case is set for Final Pretrial Conference on July 12, 2024 at 10:30 a.m.

19

- The case will proceed to jury trial beginning on <u>Monday, July 22, 2024 at 9:30 a.m.</u>

V.   CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motions for Summary Judgment [Doc. #47] is GRANTED IN PART to the limited extent that Counts 3 and 4 are DISMISSED in their entirety and Defendant Prichard is dismissed as a Defendant, but Defendants' Motion for Summary Judgment is otherwise DENIED, and the case remains set for trial on July 22, 2024.

IT IS FURTHER ORDERED that the Court adopts the Pretrial Schedule noted herein, with a deadline of May 24, 2024 to exchange proposed jury instructions and verdict sheets, a deadline of May 31, 2024 to file joint proposed jury instructions and verdict sheet, a deadline of June 21, 2024 to participate in re-convened mediation, a deadline of June 28, 2024 for Motions in Limine or other pretrial motions, with responses due July 8, 2024, and a final pretrial hearing on July 12, 2024 at 10:30 a.m. in Courtroom 1 of the United States Courthouse in Winston-Salem, North Carolina.

This, 8th day of May, 2024.

/s/ Joi Elizabeth Peake
United States Magistrate Judge
